On behalf of Plaintiff Appellants Cruz-Apeliz, Gerardo Aquiles-Velar, Marta Bonelli, Alejandro Quilez, and Carlos Quilez-Velar, I would like to ask permission to divide my time ten minutes between, for my client's appeal, five minutes. Yes, you may have that. Okay, thank you. Now, this is an assigned defect case arising out of the death of Maribel Quilez, a 28-year-old mother, and the daughter and siblings of the Plaintiff Appellants. Maribel died in an automobile accident. Counsel, you only have a very short time, and give us some credit for the fact that we know what the facts of the case are. So why don't you get to your arguments? Well, yes. The district court, in this case, after a three-week trial in which the jury decided that the plaintiff was, I mean, the decedent had incurred in no negligence, and liability was assessed between the absent third-party defendant, Municipality of San Juan, and the defendant, Ox Bodies. This regarding the rules of Puerto Rico, the law of Puerto Rico that requires the entry of judgment against defendants jointly and severally, entered judgment against Ox Bodies severally, instead of jointly and severally as required by law. In other words, the district court limited Ox Bodies' responsibility to its apportioned amount of the judgment, which is 20%. Counsel, we've actually spent a great deal of time on this case. It's very hard. It's very complicated, at least in my view. The difficulty is we can't tell from Puerto Rican law what role joint and several liability has under these circumstances. Now, the magistrate judge believed that this case was most analogous to the workers' comp area, where Puerto Rican law, as one would expect, basically says the employer is off the hook, that you go through the workers' comp system, you can't then turn around and do a contribution action against the employer. So that's sort of the only law out there other than the law about when a judgment is paid off and releases are given. But here we understand that no release was ever given, that the plaintiffs accepted payment from the municipality of the total amount of insurance, but were very careful not to release claims back over against Ox Bodies. So we're in a position where we could affirm, we could reverse, or we could say, gee, we don't know what Puerto Rican law is going to do, and this ought to be settled by the Puerto Rican Supreme Court. So why don't you tell us what outcome you think is appropriate here and why? Well, we submit that the correct outcome is to follow Supreme Court precedent that has been unwavering for over 50 years, recognizing that joint and several liability amongst our feasors. There is no such case in the Puerto Rico Supreme Court, at least that's been cited and translated to us, that deals with a co-defendant like the municipality where there is a statutory cap on the damages. And so the unique question that this case presents is whether that statutory cap takes this case out of the usual run-of-the-mine of cases and makes it comparable to the cases where the joint tort feasor is immune from suit like the workers' compensation cases. That's the problem we're struggling with. We know there's a body of law the other way, otherwise it would be easy just to affirm the magistrate judge. But what we're struggling for is whether there's any case that presents this situation, where the joint tort feasor is subject to a statutory cap and that cap is implicated by the size of the verdict. Well, that is the essence of joint and several liability. Can we start with a yes or no? Has the Puerto Rico Supreme Court decided any such case? The Puerto Rico Supreme Court, to my knowledge, has never encountered a case in which a government defendant has been joined and in which we get to a situation such as the one presented here. But we submit that this case is no different than any other run-of-the-mill case. Excuse me, counsel. You suggest that this principle of joint and several liability is inviolate, that the Supreme Court of Puerto Rico has never sanctioned any deviation from that principle, yet the workers' compensation cases that my colleagues have referred to is arguably incompatible with that inviolate principle. So I don't know how you can say that the Supreme Court of Puerto Rico has elevated that principle of joint and several liability above any other consideration. That's just not the case. Well, all the Supreme Court cases that have dealt with workers' compensation cases have been very clear that in the case of workers' compensation, there is no cause of action against the employer. So he cannot be jointly and severally liable with a third party because joint and several liability just does not exist. That's been consistently ruled by the Puerto Rico Supreme Court. There is just no cause of action. Adopting that view, the Puerto Rico Supreme Court has followed... Counsel, excuse me. Yes. In those cases, the Supreme Court of Puerto Rico actually had a policy decision to make. It made clear that the immunity of the employer could not be undone by a contribution action, but it did not have to go from that proposition to the proposition that the injured plaintiff could still not be made whole by a defendant who had been found at least partially responsible. There's no necessary link between protecting the immunity of the employer and also saying that the plaintiff cannot be made whole, consistent with those principles of joint and several liability, but the Supreme Court of Puerto Rico made a different choice. What the district court said here is there's no reason to think that the Supreme Court of Puerto Rico would not make the same choice in this case because those decisions did not seem to be linked to anything peculiar about workers' compensation law. And that at least suggests that if we were going to try to predict what the Supreme Court of Puerto Rico would do, it might justify an affirmance. I would like you, and I think my colleagues are trying to get you to suggest why there's some reason to think there's something different about this case that might lead the Supreme Court of Puerto Rico to depart from those worker comp precedents. Because joint and several liability is the rule, it's the norm, it's a policy choice that was made by the Supreme Court of Puerto Rico many, many years ago, and that is followed in all cases. This case is no different from a case in which one of the defendants, in which you have a deep pocket defendant and another defendant who's judgment proof. And the defendant who has the deep pocket and who has 1% liability winds up paying for the full amount of the judgment. These are really policy choices that ought to be made by either the Puerto Rico legislature or the highest court. There is just not a sufficient basis for a federal trial court like the district court in this case to just make law, particularly in light of the Supreme Court's recognition that there is no cause of action against the employer in workman's compensation cases because the employer is doing something that Oxbowlis hasn't done here either, which is the employer bought that risk. The employer paid a premium to be exempt from liability. Here, the district court's decision victimizes the victim and gives a windfall not to the plaintiffs, but to the party who didn't settle the case, who didn't pay a penny, and who's getting the benefit of a workman's compensation outcome when, in this case, there is a cause of action. So this is really a matter of public policy that's really for either the legislature or the Puerto Rico Supreme Court. Okay, you've reserved some time. Thank you. Good morning, Your Honors. I'm John Roach, appearing on behalf of Defendant Oxbodys. And may it please the Court, I'd like to reserve five minutes for rebuttal and spend my first ten minutes addressing plaintiff's appeal and my opening argument on Oxbody's appeal. Sure, you can have it. Thank you. Your Honors, your questions addressed the arguments we have made in the briefs. Except what your brief doesn't address is the possibility that we started with, with why isn't this case an ideal candidate on the damages issue for certification to the Puerto Rico Supreme Court? Your Honor, and that was the first question I was going to address, Judge Lynch's question, whether we should affirm, reverse, or certify the question to the Supreme Court of Puerto Rico. The proper analytical framework for this court sitting in diversity is to predict the path that the Supreme Court of Puerto Rico would travel if it had the opportunity to address this issue. Now, certainly this court has the power. But if that were the proper analytic path, the device of certification would not exist, right? So that's the proper analytic path if we can say with reasonable confidence, if we can make that prediction with some reasonable degree of confidence. What we're struggling with here is that this is a highly nuanced issue. There are good arguments on both sides. And so far as we can ascertain, or at least so far as I can ascertain, there is no Puerto Rico Supreme Court precedent either directly on point or which indicates with persuasive force which way this inquiry should come out. And I will add to that, precisely because we are a federal court, we are adverse to making policy decisions for state jurisdictions. We are adverse to making policy decisions for Puerto Rico, which is unusual in that it has a Spanish law heritage as well as the common law heritage. And I've been through the cases. I understand your arguments. I understand their arguments. But the legislature here apparently has not faced the question. The Supreme Court of Puerto Rico has not faced the question. It's perfectly appropriate to say that these are significant policy choices. We can agree on that, can't we? Yes, Your Honor. I actually looked to other states, many of them, to see if I could figure out whether there was a majority view on this. And as best I can tell, there are a number of different views, but there is not a majority view. Do we agree on that? No, Your Honor. We did not find any cases, and plaintiffs does not cite any cases in their brief nor in all arguments today that supports the argument that they're presenting to this court, that where there is no right of contribution against a joint tort visa, the defendant should be liable more than his or her or its proportionate share of liability. The only case cited by plaintiffs was that case where they traveled to the Missouri Court of Appeals, and that case is not applicable. Well, but here there is a right of contribution up to a certain amount. Just up to a certain amount. Yeah, but that's not the same thing as saying there's no right of contribution, is it? Well, there is no right of contribution for the portion of the damages allocated to the municipality for which the plaintiffs are asking the court to hold Oxbody liable. In other words, for the portion of damages above the $500,000 cap. Your Honor, just to go back to your first question. But that does not mean that your client is not severally liable. And this is not put in terms of an indemnity. It's merely a cap on the sum that can be recovered from the municipality. We've gone back, we've read the statutes. We can't tell from the statutory language exactly what the legislature intended here. Yeah. Your Honor, I will respectfully submit that the district court got this right by pointing out that there is no meaningful difference between the workers' compensation statute. Yes, on that point I would reverse, because I think there is quite a meaningful difference. The panel may well have different views on this. But I don't see why the workers' compensation scheme should be analogized to this at all. And I don't find any Puerto Rico cases which do draw that analogy. Yes, Your Honor. Well, not that draw the analogy, but we did cite the workers' compensation cases for the principle that a joint liability and contribution are a two-way street. When a joint tort fee doesn't have the right of contribution, the rationale behind joint and several liability eviscerates. And that's the same concept that the Supreme Court of Puerto Rico applied in the Sendry v. Hospica case. But, counsel, excuse me, that principle might make sense in a situation where a plaintiff, through a settlement with one of the defendants, has chosen basically to alter the principle of joint and several liability by limiting the exposure of the party with whom that plaintiff has settled. That makes sense. Then it follows from that that there are set-offs. There's a proportional allocation of responsibility when it comes to damages. We don't have that here. As Judge Lynch pointed out earlier, the plaintiff has been very careful here not to release anybody from liability, not to indemnify anybody. What's happened here is the plaintiff faces an immunity imposed by statute. So it seems a very, very different situation than the situation that you were starting to describe. And it's just another complication in this case, which is very troubling. Your Honor, I think I and I think the district court would agree with what you just said and incited the Sendry case as a secondary analogy to the workers' compensation cases. But what it does stand for is this general principle, followed by the Supreme Court of Puerto Rico in the workers' comp cases and in the release of the joint tort visa case, that the basic premise, the underlying premise or rationale, policy behind joint and several liability has within it this two-way street that the defendant has a right of contribution against the other defendant if it pays its share of liability. That right of contribution, as was pointed out by the appellant, is theoretical only in the case of a joint tort visa who's broke. And here it's more than theoretical because at least you can get something by way of a contribution because of where the cap is. You just can't get everything. So I'm not so sure that analogy is persuasive. Well, Your Honor, yeah, the municipality is immune over $500,000 and the plaintiffs in this case did receive that $500,000 from the municipality. But the point here is that their Oxbodies has no right of contribution against the municipality because of its statutory immunity. It has a right of contribution up to the $500,000, right? It would have effectively no right of contribution at all if the joint tort visa was an uninsured motorist who was living on government benefits. Well, the right may still be there. They don't have the capacity because the person is doing it. But you see, that's just the argument in this case. That the right may still be there. You just don't have the capacity to enforce it because of the statutory bar. The plaintiffs see the statutory bar as different, materially different, than an immunity. You see them as the same thing. That's the policy conflict that we're suggesting is best resolved by the legislature or by the Puerto Rico Supreme Court. Your Honor, I can't, if you decide to certify this question to the Supreme Court of Puerto Rico, I'm not disputing either your right or your rationale for doing that. I would point out that the plaintiffs here did not ask the court  But I would say that certainly the court doesn't have to certify this question. It can make a prediction as to what the Supreme Court would do. Well, I guess that's the argument to come. You don't want to certify because you think there shouldn't have been any damage at all. There shouldn't be any judgment against Ox Bodies. And if I could turn my attention to this, maybe I'll use the last, with all the questions, to address Ox Body's appeal, if I may. And I'll use my remaining time, if that's okay with the court. Let me ask you something. Should, I appreciate your concession that the court could, of course, certify to the Puerto Rican Supreme Court. I would assume that if that was the case, that the parties would like an opportunity to brief the question of the appropriate questions to be put to the Puerto Rican Supreme Court. Am I correct in that assumption? Well, certainly we would like the opportunity. Of course, Your Honors, we do want to say that we think their appeal is moot because we think our appeal is not recorded. Of course, of course. Well, on that theory of fairness to the parties, without predicting the outcome of the case, each of you will have 20 days to make a supplemental filing with us from the date of oral argument. Don't try to put a thumb on the scale as to whether or not we will certify. Merely address the appropriate questions that you think should be certified. And actually, if you two wouldn't mind talking to each other, an agreed-upon set of questions are always welcomed by the court. We're happy to do that, Your Honor. 20 days. Thank you, Your Honor. Your Honor, Oxbody's argument in its appeal is that the trial court erred in ruling that the alternative design opinion of expert Perry Ponder was admissible under Daubert and Federal Rule of Evidence 702. Just very quickly, as you know, defendant's jeep rear-ended the right-hand corner of the truck's trash body, which was installed by Oxbody's. When the jeep hit the trash body, the trash body entered the jeep's passenger compartment, hitting the decedent. Plaintiffs allege the design defect in the underride guard on the trash body, and Mr. Ponder proposed an alternative design consisting of widening the underride guard to be as wide as the trash body, bracing the underride guard with diagonal bars, and moving the underride guard further toward the back of the truck. Mr. Ponder's alternative design does not meet any of the four requirements, any of the four factors under Daubert for the admissibility of a scientific opinion, and this is a purely scientific opinion. He did not construct and test his alternative design to determine whether it could withstand the force of the crash and prevent intrusion of the trash body into the jeep, notwithstanding that plaintiffs admitted in their briefs that it would have cost less than $200 for him, less than $200 to build a prototype of his alternative underride guard, nor did he perform any computerized testing of his underride guard to determine how it would perform. Well, he says he did it the old-fashioned way. He just did the mathematics of it. He didn't deny the importance of the analysis, which you see should have been done. He says you don't have to use a computer to do it, and so he says he did an equivalent analysis, just not the way you say it should have been done. None of his tests or any of the studies he pointed to show whether the alternative design would have withstood the force of the collision and whether the alternative design would have prevented the injury by causing the jeep to rotate away from the trash body rather than intruding into the jeep. None of his studies, none of his tests do any such thing. Well, you seem to be imposing all these formal requirements and saying they are requirements of law, and he says, well, there are other ways of assuring scientific reliability. It doesn't have to be done in any one particular way. What's wrong with that? Because his methodology is not scientifically valid. He doesn't come forward with any test or study or calculation that shows that his alternative design would have prevented the injury that occurred, that his alternative design would have performed differently than the current design of the trash body. And that is the key component. This case, like most Dalbert cases, the devil is really in the details. And here to this appellate court, the court plaintiffs, with all due respect, have essentially done something that often parties do in a trial court in response to a document request. There's a huge document dump pointing to studies and calculations and the like, but the overwhelming bulk of them deal with Mr. Ponder's accident reconstruction opinion, which he provided at trial. They don't deal with any testing of the under-eye guard to show that it would have performed in a certain way in this accident so that it would have withstood the force generated by the jeep hitting this alternative guard and whether when the jeep hit this alternative guard, the jeep would have rotated away rather than the trash body intruding into the compartment of the jeep. Just finally, if I may, Mr. Ponder's analysis doesn't meet any of the other three factors of the Dalbert test, and I specifically asked the court. We cited a number of cases from other circuits, but the Audi case from the Third Circuit is indistinguishable from the case here. That involved automobile bumpers, and just like here, the expert in Audi could not show that the alternative bumper design would have performed differently and prevented the injury, and as a result, the Third Circuit affirmed the exclusion of that expert's opinion. I'm going to give you a choice. If you have more to say on this point, would you like to say it now rather than after your brother has his five minutes and you take your five minutes, or would you rather... I think he's already used his five minutes. Have you? Oh, you have used it. I'll give you two more sentences. Okay, just for the two more sentences, I would like to talk just a little bit more about the Audi case because it's in the Third Circuit. I wouldn't bother. Thank you, Your Honor. Then I'm finished in that case. Thank you very much. So I do not have rebuttal time. No, you've used it. Okay, well, thank you, Your Honor. And I thank you very much. The standard for admission of expert testimony, as this Court has observed, is not appellant-friendly. And in Restroche, which is the leading First Circuit case on this matter, this Court ruled that reversal on the admission of an expert witness testimony is only proper if the district court committed a meaningful error in judgment by admitting the expert witness. If you scratch the surface of the defendant's argument regarding Mr. Ponder's testimony, the arguments made by the defendant, it's really arguments that were made to the district court, that were made to the jury regarding all the deficiencies that, according to the defendant, Mr. Ponder's testimony had, and they're great arguments for a trial, but they don't hold water in terms of challenging the basis for Mr. Ponder's opinion. They cite not a single study, as, for example, was the case in Restroche, in which the Court was confronted with two separate lines of scholars holding different positions. But Oxbody stands here and says, well, Mr. Ponder didn't do this, didn't do that, but they didn't show any significant or any study for that matter that establishes that what Mr. Ponder did was not proper. Why don't you turn it? What studies did he rely on? Well, Mr. Ponder, first and foremost, Mr. Ponder used, he didn't reinvent the wheel. Except for, in the district court, he used stress analysis, which is a form of testing, in comparison to other on-the-right guards to test their resistance. We cannot lose sight that this is not a complicated design defect case. Mr. Ponder wasn't redesigning a sophisticated piece of machinery or equipment. What we're talking about is a solid barrier that has to be designed in such a way that it can withstand the impact of a moving vehicle without allowing for on-the-right. That's what this boils down to. So it's nothing out of this world or cutting-edge or extraordinary. Mr. Ponder used, for example, the Nixa 208 crash test. This is a test used by the government. And in this test, a vehicle is crashed into a solid wall at 30 miles per hour. And there is no injury to the dummy who's inside that vehicle because there is no PCI, there's no passenger compartment intrusion. The council didn't, I mean, it's not that complicated, I guess, but the fact is your expert suggested that an elongated protective guard structured in a somewhat different way would have prevented the penetration of the passenger compartment. Apparently, such an elongated guard structured, supported in the way that your client would support it, has never been used before. These kind of guards have been, perhaps incorrectly so, state-of-the-art for many, many years. He was proposing something that had never been used before, I guess, hence had never been tested before. And although he did do, I guess, mathematical analysis, he did not, in fact, create a prototype and subject it to any kind of testing. So that's somewhat troubling. It's completely new, would have been very easy to make a prototype, wouldn't cost much at all, but he chose not to do any of that. Because there's a lot of, there are lots of studies out there that validate the strength that this underwrite guard, or different underwrite guards can withstand. So, Mr. Ponder did not build a prototype, which by the way, this court cited a restructure with approval of the restatement of torts, third, that establishes that there's no need to build a prototype. The other thing that if I'm allowed to, that I... Did he say there is already existing a type of underguard that is superior to what they used? Well, the one that's used under the same regulation, under 396A, which had the same standard, the same parameters that the underwrite guard for this type of truck had until 1998, when it was, when they made a tougher standard for semi-trucks and kept the same standard for this one, for these types of trucks. And we were trying to present evidence at the trial level that the reason why no changes have been made is because of the lobbying by the industry. That has consistently opposed, and we were not able to present that evidence, Your Honor. Counsel, yes or no? Do you remember my question? I'm sorry, I thought that I... Did he testify that there was an existing underguard out there that would have been better than the one that was actually used? Yes or no? To the best of my recollection from his testimony, he said that there are better underwrite guards out there and that there's the scientific basis and the studies that establish that the better underwrite guards than the ones in use are in existence. Okay, thank you. Thank you.